John S. YOUNG, Plaintiff–Appellant,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,** Defendant–Appellee.

No. 91–1399.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1991.

Decided Feb. 28, 1992.

Kenneth F. Laritz (argued), Warren, Mich. and Gerald Benjamin, Southfield, Mich., for plaintiff-appellant.

Clifford D. Johnson, Asst. U.S. Atty., Office of the U.S. Atty., South Bend, Ind., and Denise McDuffie Martin (argued), Dept. of Health and Human Services, Region V, Office of the Gen. Counsel, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, WOOD, Jr.* and CUDAHY, Circuit Judges.

* Judge Wood, Jr. assumed senior status on January 16, 1992, after oral argument in this case.

CUDAHY, Circuit Judge.

John S. Young applied for Social Security Disability Insurance Benefits (benefits) from the Secretary of Health and Human Services (Secretary). An administrative law judge (ALJ) denied benefits, finding that Mr. Young did not have a severe impairment. Mr. Young appealed that decision to the Appeals Council (Council), which also denied benefits but based its decision on different grounds. The Council found that Mr. Young did have a severe impairment, but that this impairment did not fulfill the criteria for a finding of disability. In the same connection, the Council found that Mr. Young had the residual functional capacity to perform his past relevant work. Mr. Young appealed the Council decision to the district court which affirmed the Secretary, finding that the decision was supported by substantial evidence. Mr. Young now appeals and we vacate and remand.

## I.

John Young is a graduate of Indiana University with a bachelor's degree in Liberal Arts. He was fifty-five years old at the time of his 1988 hearing. He suffers from epilepsy and complications relating to the treatment of that disease. He developed epilepsy in 1955 when he was involved in an automobile accident, in which he suffered a head injury and lapsed into a coma. He recovered from the coma and the resulting amnestic condition, but developed a history of grand mal and petit mal seizures. He has undergone two brain surgeries to attempt to correct the problem, one of which was a lobotomy. He takes several prescription drugs to control his seizures, including Dilantin, Tegretol and Phenobarbital.

During the time relevant to this application, Mr. Young's seizures were successfully controlled by this medication. However, he asserts that the medication, as well as the surgeries, have caused him to undergo personality changes. These changes have affected his personal relationships. At home, he has become difficult to live with, exhibiting antisocial behavior, poor personal hygiene and poor communication skills. Mr. Young's antisocial behavior is manifested in his vocabulary as well as in public displays of vulgarity such as painting obscene words on the garage door of his home. He has exhibited pornographic photographs to a (then) minor son and the son's friends. This behavior resulted in a divorce and in alienation of his family. Mr. Young states that people seemed to find him repulsive although he did have a few friends.

Mr. Young also asserts that his ability to work quickly, or even properly, was affected by medication and surgeries. At General Motors, Mr. Young was asked by his supervisors to take sick leave in 1979 because he could not adequately perform his job. Notably, Mr. Young did not perceive his work performance in the same light as his supervisors. He felt, apparently erroneously, that his work performance was satisfactory. After a year of sick leave, he was put on disability retirement and has not been employed since 1980. The relevant time period encompassed by his current application is from June 4, 1981, to September 30, 1985, the final date of his eligibility.[1]

## II.

The Seventh Circuit decides disability cases, as does the district court, by reviewing the final decision of the Secretary to ensure that it is supported by substantial evidence. *Key v. Sullivan*, 925 F.2d 1056, 1061 (7th Cir.1991). The Secretary has delegated authority to make the final decision to the Council. *Arbogast v. Bowen*, 860 F.2d 1400, 1402 (7th Cir.1988). Thus, we review the factual findings of the Council, not those of the ALJ. *Pitts v. Sullivan*, 923 F.2d 561, 564 (7th Cir.1991). When reviewing those findings, we do not determine if the claimant is disabled, nor do we reweigh the evidence. *Stuckey v. Sullivan*, 881 F.2d 506, 508 (7th Cir.1989). However, when evaluating whether sub-

---

1. Mr. Young filed a previous application for benefits that was denied on June 3, 1981. He did not request that this decision be reopened pursuant to 20 C.F.R. § 404.987 (1991).

stantial evidence exists to support the decision, we consider the relevant evidence that a reasonable person might accept as adequate to support a conclusion, taking into account anything in the record that fairly detracts from its weight. *Arbogast*, 860 F.2d at 1403. Substantial evidence may be something less than the greater weight or preponderance of the evidence. *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986).

■ When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991); *Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–92, 96 L.Ed.2d 119 (1987); *Arbogast*, 860 F.2d at 1403 n. 1. The claimant bears the burden of proof in steps one through four. If that burden is

met, the burden shifts to the Secretary to prove that the claimant cannot perform other work in the economy. *Ray v. Bowen*, 843 F.2d 998 (7th Cir.1988).

The Council reviewed the medical evidence to make its findings. In those findings, the Council briefly stated that Mr. Young was not disabled under each step of the inquiry. The Council also concluded that during the period of claimed disability Mr. Young could perform work as a shipping and receiving clerk, as a scheduler or as a checker. Mr. Young raises several arguments to refute these conclusions.[2]

### A. *Organic Mental Disorder.*

■ Mr. Young claims to suffer from an organic mental disorder as defined in the regulations. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02 (1991). The Council disagreed. To reach its conclusion, the Council performed a multi-level analysis. First, it determined that Mr. Young suffers from a severe mental impairment. 20 C.F.R. § 404.1520a(c)(1) (1991). Next, the Council examined the mental impairments that, if shown, the Secretary presumes disabling. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02–12.08 (1991).[3] The Council determined that Mr. Young suffered from none of these listed impairments.

■ One of the listed disabilities describes "organic mental disorders." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02. To qualify for benefits pursuant to this regulation, the claimant must fulfill the criteria in both section A and section B of the statute. The Council found that Mr. Young fulfills the section A criteria.[4] The

---

**2.** The Secretary challenges these arguments on the grounds that the claimant has waived all but one by not raising them in the district court. *Cf. Cheshier v. Bowen*, 831 F.2d 687, 689 (7th Cir.1987). An issue on appeal of the Secretary's decision not raised in the district court is waived. *Id.* Mr. Young has waived two of the issues he attempts to raise on appeal: 1) whether the hypothetical question posed to the vocational expert included all relevant factors; and 2) whether a decision by an ALJ in Mr. Young's earlier application is *res judicata* with respect to the Council's finding that Mr. Young can perform past relevant work. We believe Mr. Young raised all his other issues in the district court.

**3.** If Mr. Young were to suffer from any of those impairments, no consideration of his age, education or work experience would be required. Disability would be presumed for statutory purposes. 20 C.F.R. § 404.1520(d).

**4.** Section A includes:

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
1. Disorientation to time and place; or
2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember in-

Council found, however, that Mr. Young does not fulfill the criteria under section B. Section B lists four functional limitations related to "organic mental disorders." Two of the four must be present to fulfill the requirements of section B. These limitations are: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or 4) repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from a particular situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02(B)(1)–(4). These are superficially the same four criteria by which the Council determined that Mr. Young had a "severe mental impairment." However, the criteria for finding a "severe mental impairment" do not demand as great a *degree* of limitation as do the criteria for an "organic mental disorder."

First, the Council decided that Mr. Young does not suffer a marked restriction in his daily living. Mr. Young lived both alone and with his mother at the relevant times and stated that he performed household chores and grocery shopping and carried on a hobby (Mr. Young collects stamps).

Second, the Council decided that the appellant has a moderate degree of impairment of social skills. The Council considered physicians' reports and affidavits submitted by some of Mr. Young's relatives, as well as statements made by Mr. Young and a casual social acquaintance. These statements and affidavits detailed his social problems and discussed his ability to interact with others.

Third, the Council decided that Mr. Young seldom suffered from "deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner." This conclusion was supported by the report of Dr. Uematsu, the surgeon who performed the appellant's lobotomy. Dr. Uematsu stated that Mr. Young "appeared to be confident mentally" but that he needed to be evaluated further by cortical function [5] and psychiatric consultation. (Report of October 28, 1977). On another occasion, Dr. Uematsu reported after a brief exam that Mr. Young had clear mentation and was "very much normal intellectually, mentally, as anyone else." (Report of December 17, 1977). However, Mr. Young's other physicians do not agree with Dr. Uematsu.

Four doctors' reports indicate that Mr. Young suffers from concentration and memory deficiencies (Dr. Taylor, Dr. Panic, Dr. Spies and Dr. Limcaco).[6] Dr. Panic,

---

formation that was known sometime in the past); or

   3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

   4. Change in personality; or

   5. Disturbance in mood; or

   6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

   7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels of overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.

5. Apparently the doctor was referring to the cerebral cortex, the outer layer of cerebrum.

6. The doctors stated the following:

Dr. Taylor: "There may also be early signs of dementia as [Mr. Young's] memory and cognitive ability are slightly impaired, and [Mr. Young] is prone to catastrophic reaction to stress." (Report of November 4, 1977).

Dr. Panic: "[Mr. Young] has had difficulty keeping up his job performance, showing a decrease in pace and ability to carry through orders." (Report of March 3, 1980).

Dr. Spies: "I would like to suggest that it might be as well if his employers were advised not to put him on tasks requiring mental flexibility or those requiring a logical ordering of data, as he would probably have some difficulty with these. He may also show some lapses of short term memory." (Report of June 14, 1980).

Dr. Limcaco: "In regards to your questions as to whether or not the patient is permanently or totally disabled from engaging in any gainful occupation, the patient, I feel in a neurological point of view and on the basis of psychometric testing, will not be able to perform work that will require judgmental and intellectual decisions. On the other hand, the patient probably (since he does not have total paralysis) could be

medical director at the General Motors division where Mr. Young worked, reported that his deficiencies were preventing Mr. Young from completing tasks in a timely manner. In addition, Mr. Young stated that he was unable to perform work quickly and competitively due to the medication. The management staff at General Motors considered Mr. Young's job performance inadequate and offered him disability retirement. Their actions and Mr. Young's statements indicate that Mr. Young did indeed have a problem completing tasks in a timely manner. The reports of Drs. Taylor, Spies and Limcaco do not address the timeliness issue.

These same deficiencies that indicate a timeliness problem may also indicate a concentration problem. In addition, Mr. Young displayed other characteristics of concentration deficiency. These were substantiated by statements of relatives that Mr. Young has difficulty following and remembering conversations and that he answers questions inappropriately.

Fourth, the Council held that Mr. Young did not suffer deterioration (a criterion listed as item (4) of regulation 12.02(B)) because there were no documented instances of deterioration-related episodes reported in the record.

Thus the Council found that Mr. Young suffers at least some degree of impairment related to items two and three of the grid. The regulations require that the claimant experience a "marked" degree of limitation before the "social skills" standard of the regulation is fulfilled. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02(B)(2). The "moderate" degree of impairment of social skills (referring to criterion number two) found by the Council is one degree short of being "marked", 20 C.F.R. § 404.-1520a(b)(3), and thus fails of recognition as a 12.02(B) limitation. The regulations explain a "marked" limitation in the following way:

> "Marked" is not the number of areas in which social functioning is impaired, but

the overall degree of interference in a particular area or combination of areas of functioning. For example, a person who is highly antagonistic, uncooperative or hostile but is tolerated by local storekeepers may nevertheless have marked restrictions in social functioning because that behavior is not acceptable in other social contexts. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(C)(2).

But Mr. Young's behavior as described in the reports may well evidence "marked" social limitations as defined in the regulations. The behavior that has been described certainly might be considered unacceptable in many social contexts. However, the Council did not address this particular evidence in its analysis. Merely to state summarily that Mr. Young reportedly had difficulty getting along with people and that he lacked social skills does not address behavior that is clearly socially unacceptable. This behavior should be considered, and the Council should clearly indicate consideration of it in its analysis.

Moreover, the Council's conclusion that Mr. Young was only "seldom" impaired by deficiencies of concentration, persistence or pace (referring to criterion number three) is arguably not supported by substantial evidence. Functional limitations of this sort are categorized by degrees of "never, seldom, often, frequent, and constant." 20 C.F.R. § 404.1520a(b)(3). Thus, the Council has determined that Mr. Young displays the least frequent degree of limitation (short of "never") that is recognized by the regulations. Our interpretation of the medical evidence on this subject is difficult to reconcile with the Council's. We believe that the evidence may indicate a greater frequency of impairment than "seldom". Our review as to evidentiary support considers anything in the record that fairly detracts from the weight of the evidence supporting the Council's decision. *Arbogast*, 860 F.2d at 1403. Dr. Uematsu's report, although not cited by the Council, seems to support its finding. Instead, the

---

employed in jobs that entail no mental judgmental decision making. In addition, the patient should also be protected from any activity that

may expose him to harm, as well as his other employees, if he should ever develop a convulsion." (Report of May 11, 1981).

Council cited Dr. Spies' report, commenting that the doctor did not note any specific difficulty with concentration. However, the doctor *did* note the claimant's difficulty in performing tasks requiring mental flexibility or logical ordering of data. Unlike the Council, we must view Dr. Spies' statement as raising a question whether the difficulty with mental flexibility and logical ordering of data is associated with a failing of concentration. Additionally, the Council made no mention of the reports of three other doctors indicating limitations linked to criterion three. Further, the Council did not address Mr. Young's testimony or the affidavits by his former wife and his relatives. The Council may have a sound basis for rejecting the plentitude of evidence bolstering Mr. Young's claim, but the record reveals no such basis. We are unable to adequately review the Council's decision without a clear articulation of the reason it rejected this evidence. *Zblewski v. Schweiker,* 732 F.2d 75, 78–79 (7th Cir. 1984).

### B. *Credibility Determinations.*

■ Mr. Young argues that the ALJ did not make clear credibility findings with respect to his subjective complaints. Hence, he says that the Council incorrectly decided that these complaints were not credible. An ALJ's credibility determinations are, of course, entitled to considerable weight. *Cheshier v. Bowen,* 831 F.2d at 690. If the Council rejects credibility findings of the ALJ, the grounds for rejection or for the making of inconsistent findings should be articulated. *Bauzo v. Bowen,* 803 F.2d 917, 922 (7th Cir.1986). Again, this presentation allows the reviewing court to determine if substantial evidence supports the Council's conclusion. *Id.* In this case, the ALJ found that the claimant's subjective claims were not substantiated by the medical evidence. The ALJ did not state specifically that Mr. Young's subjective complaints were not credible, but the implication is clear: that the claimant was not credible in light of the medical evidence.

The Council did not reject this implied finding but simply made it explicit. The Council added that the vocational expert's testimony also weighed against Mr. Young's credibility. Thus, in light of the expert testimony and the medical reports, the Council did not find Mr. Young's complaints credible.

The vocational expert testified that Mr. Young could perform his duties as either a checker, a schedule man or a shipping and receiving clerk. Dr. Barkhaus stated that these jobs could be performed because, among other things, they do not require much contact with people and require some, but not "a lot" of, concentration. The expert maintained that they are fairly repetitive and do not require independent decision making or judgment. Dr. Barkhaus' testimony may preclude a finding of disability under step four of the five-step test (i.e., performance of past work).

The record does not indicate that Dr. Barkhaus accurately assessed the characteristics of Mr. Young's former jobs. In this respect, the Secretary relies on several sources in determining what duties are required by a particular job. The *Dictionary of Occupational Titles*[7] is one of those sources. 20 C.F.R. § 404.1566(d)(1) (1991); *Tom v. Heckler,* 779 F.2d 1250, 1255 (7th Cir.1985). The *Dictionary* provides generalized job descriptions for the positions that Mr. Young formerly held and that the vocational expert reported were within Mr. Young's capabilities. These job descriptions are not consistent with the restrictions on Mr. Young's capabilities as determined by the Council.

In addition, Mr. Young submitted a vocational report indicating that some analysis and concentration may be required in his former positions. The Council failed to note whether it considered Mr. Young's report. Even the government's brief states that Mr. Young's jobs involve filing and keeping records—functions that may require analysis and concentration. (Appellee's Brief 24). Interestingly, the regu-

**7.** United States Department of Labor, United States Employment Service; Volume 1, Fourth Edition, Revised 1991.

lations recommend filing index cards as one of the procedures to be used to test concentration, persistence and pace. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.-00(C)(3) (1991). The regulations go on to state that strengths and weaknesses in concentration can be reflected in frequency of errors and in the time required to complete tasks, as well as in the assistance required. *Id.* There is no discussion of these points, although the Council acknowledges that Mr. Young's employer recommended he retire because his work was inadequate.

We have previously considered vocational expert testimony that seemed to contradict actual job requirements. *Tom,* 779 F.2d at 1256. In *Tom,* Dr. Barkhaus was also the vocational expert. There, he considered all the relevant factors and determined what jobs the claimant could perform. However, the description of the jobs in the *Dictionary* did not seem in *Tom* to correspond to activities within the claimant's capabilities, thereby undermining Dr. Barkhaus' opinion. The ALJ in *Tom,* as did the Council here, relied on Dr. Barkhaus' evaluation of what skills the jobs required, and found the claimant not disabled. *Id.* at 1256–57. We remanded *Tom* for further consideration of these apparent discrepancies. *Id.* at 1258 n. 12.

## C. *Other Work.*

The Secretary argues that Mr. Young can perform other work in the economy and therefore should not receive benefits. Dr. Barkhaus indicated that Mr. Young could perform tasks such as janitorial work and animal care. However, the Council did not cover this testimony in either its findings or in its analysis. The Secretary urges us to assume that the Council adopted the ALJ's finding that Mr. Young could perform other work in the economy. However, this suggestion ignores the fact that the ALJ concluded that Mr. Young was not severely impaired. The Council changed that underlying premise when it found that Mr. Young was severely impaired. Thus, there is a contradiction in arguing that the Council adopted the ALJ's finding that Mr. Young can perform other work in the national economy. In this re-gard, the Council has provided only a citation with no explanation, and this is not adequate for our review.

## D. *Side Effects.*

Mr. Young asserts that the Council did not properly consider the side effects of the medication he takes to control his seizures and behavior problems. In his testimony before the ALJ, Mr. Young claimed that he was sometimes sleepy as a result of taking medication, that the medication made his eyes tired and that the medication affected his ability to work as quickly as his coworkers. The Council recognized that the claimant is sleepy part of the day due to his medication. In his brief, Mr. Young lists other possible side effects of the prescription drugs which he uses. But the claimant does not complain that he suffers from those side effects. Therefore, the Council considered all complained-of side effects, and Mr. Young's objections in this regard are not well taken.

## III.

■ We must defer to the determinations of the fact-finder. Nonetheless, within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review. *Zblewski,* 732 F.2d at 78–79. In *Zblewski,* we remanded to the ALJ to give a minimal articulation of why the claimant's line of evidence was rejected. "In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is 'substantial' only when considered in isolation." *Id.* In the case before us, the Council did not explicitly reject claimant's evidence. Although the Council recapitulated both the claimant's and the Secretary's evidence in commenting on Mr. Young's physical limitations, the Council does not articulate its reasons for rejecting evidence favorable to him in discussing Mr. Young's mental limitations.

There may be substantial evidence to support the Appeals Council's decision, but the Council did not address an entire line of medical evidence apparently supporting Mr.

Young's claim. And the Council relied on a vocational expert's testimony that does not jibe with standard references. Therefore, we vacate and remand for further analysis and explanation of the evidence relating to his mental impairments and to the skills and duties entailed in his former jobs as well as the other matters addressed in this opinion.

VACATED AND REMANDED.